# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Synthes USA, LLC, et al., ) | |
|         Plaintiffs, ) | No. CV-09-711-TUC-DCB-DTF |
| vs. ) | **REPORT AND RECOMMENDATION** |
| Diverse Surgical Supplies, Inc., et al., ) | |
|         Defendants. ) | |

This matter is before the Court for claim construction, pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996). The parties filed a Joint Hearing Statement with attached exhibits (Docs. 97, 107), opening briefs (Docs. 91, 102, 103) and response briefs (Docs. 105, 106). Pursuant to the Rules of Practice in this Court, the matter was assigned to Magistrate Judge Ferraro for a report and recommendation. A hearing was held on December 14, 2010, and the parties' power point presentations were subsequently submitted as part of the electronic record of the case (Docs. 112, 119). The Magistrate recommends the District Court, after its independent review of the record, construe the terms as set forth below.

## BACKGROUND

Defendants (Diverse) are alleged to have infringed three of Plaintiffs' (Synthes) patents for bone plates: patent 5,709,686 ('686 patent) issued in 1998, patent 6,719,759 ('759 patent) issued in 2004, and patent 7,354,441 ('441 patent) issued in 2008. As set forth in the '759 patent and the '441 patent, the invention: "relates generally to devices for fixation

of parts of a fractured bone and more specifically, to bone plates and systems for stabilization and/or compression of parts of a fractured bone." '759 patent 1: 14-17; '441 patent 1: 16-19.

As explained in the '441 patent, the improvement made by the inventions are that a single bone plate can be used for two types of osteosynthesis, which is the surgical process of joining together the ends of fractured bones:

> Bone plates may generally be utilized to carry out two different types of osteosynthesis, namely "rigid osteosynthesis" and "flexible osteosynthesis." Rigid osteosynthesis is used for medical care of joint fractures, simple shaft fractures (where nailing is impossible) as well as for osteotomies. . . .
>
> Flexible osteosynthesis . . . may be desirable in the medical treatment of comminuted fractures in the shaft region of tubular bones. In the case of these fractures, it is an objective to maintain the proper length of the bone and to fix the bone ends (joints) in their proper anatomic positions with respect to one another. . . . Bone plates designed for flexible osteosynthesis thus operate similarly to a locking, intramedullary nail, which is anchored only in the metaphyses.
>
> Since fractures cannot always be treated with one type of osteosynthesis, surgeons must frequently compromise because a bone plate, which allows him to combine the two types of osteosynthesis discussed above, is not available.
>
> . . . .
>
> The present invention is directed to a bone plate that is adapted to be used for both rigid and flexible osteosynthesis, without compromising the ability of the plate to be used for either type of osteosynthesis. Accordingly, the bone plate of the present invention may be used as a compression plate or as an internal fixative.
>
> This objective is accomplished with a bone plate having at least one "combination hole." The combination hole may be used with a screw having a substantially spherical head to provide for compression of the fracture, or may be used with a screw having a threaded head to fix the position of the screw with respect to the bone plate and serve as an internal fixative.

'441 patent, 1: 23-28, 38-53, 2: 8-20. The '686 patent describes the process less technically:

> The object of the invention is palliation and to create a bone plate of which the boreholes are designed selectively to make possible two different kinds of screw anchorings. In the first application [rigid osteosynthesis], a bone screw with a spherical head may be screwed into an elongated slot of the plate within a wide and selectable range at an angle to the plate normal into the bone. By tilting the countersink of the plate boreholes, furthermore a compressive effect is made possible.
>
> In the second application [flexible osteosynthesis] a bone screw with a head thread and in the form of a bracing screw can be vertically and rigidly screwed into the plate at the partial inside thread of the elongated slot.

- 2 -

1 | '686 patent, 1: 21-32.

2 | The critical claims from each patent are set forth below:

3 | 1. A bone plate comprising:

4 | an elongated plate defining a longitudinal axis along its length having an upper surface, a lower surface for application to a bone, and a plurality of elongated holes arranged along the length of the plate for receiving bone screws, said elongated holes being oblong in shape and having a major axis $D_L$ and a minor axis $D_Q$, with $D_L$ being greater than $D_Q$,

7 | wherein at least one of said elongated holes includes partial threaded portions arranged on an inner wall of the elongated hole, and is configured for seating a bone screw having a threaded head.

9 | '686 patent 3: 2-9.

10 | 14. A bone plate defining a longitudinal axis and comprising:

11 | an upper surface;

12 | a lower surface;

13 | a first hole extending through the upper and lower surfaces, the first hole defining a central axis and being elongated in a direction substantially aligned with the longitudinal axis, wherein the first hole is at least partially threaded; and

15 | a second hold extending through the upper and lower surfaces and defining a central axis, the second hole being at least partially threaded, and tapering inward in a direction along the central axis from the upper surface to the lower surface.

18 | '759 Patent 5: 52-64, 6: 37-51.

19 | 1. A bone fixation system comprising:

20 | a bone plate having an upper surface, a lower surface, and at least one combination hole extending through the upper surface and the lower surface, the at least one combination hole including:

22 | a first portion having a substantially circular outer periphery defining a center point, and a plurality of threads disposed on the outer periphery, the plurality of threads extending over an angle of greater than 180° with respect to the first center point; and

24 | a second portion overlapping the first portion and having an unthreaded elongated outer periphery defining a second center point;

26 | wherein the first center point is spaced apart from the second center point along the upper surface; and

27 | a bone screw having a threaded head for engaging the first portion;

> wherein the plurality of threads on the first portion of the hole are configured and dimensioned to enclose and engage the threaded screw head over an angular ranger greater than 180º to prevent the screw from shifting laterally toward the second portion of the hole.
>
> 2. A bone plate comprising:
>
> an upper surface;
>
> a lower surface; and
>
> at least one combination hole extending through the upper surface and the lower surface, the at least one combination hole including:
>
> a first portion defining a substantially circular outer periphery and a plurality of threads extending around the outer periphery over an angle greater than 180º; and
>
> a second portion in communication with the first portion and defining an elongated outer periphery, wherein the first portion defines a concave recess in the upper surface of the bone plate,
>
> wherein the plurality of threads are configured and dimensioned to enclose and engage a threaded screw head over an angular range greater than 180º and prevent the screw head from shifting laterally toward the second portion of the hole.

'441 patent 6: 58-68 – 7: 1-31.

## **LEGAL STANDARD**

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004). The construction of patent claims, which requires determining the meaning and scope of the claims, is a matter of law for the court. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71, 976 (Fed. Cir. 1995), *aff'd* 517 U.S. 370 (1996). The terms of a claim are to be given their "ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges," in which case claim construction "involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. There are two situations

1  when a court should ascribe claim terms a meaning other than the ordinary and customary
2  one: if the patentee acts as his own lexicographer and explicitly defines a claim term; or if
3  the claim term is so unclear that its scope cannot be ascertained from the language used.
4  *Johnson Worldwide Assoc., Inc. v. Zebco Corp.*, 175 F.3d 985, 990 (Fed. Cir. 1999).

5  When interpreting claims, a court looks first at "the words of the claims themselves,
6  the remainder of the specification, [and] the prosecution history." *Innova*, 381 F.3d at 1116
7  (citing *Markman*, 52 F.3d at 979-80); *Phillips*, 415 F.3d at 1313 (claim terms are to be
8  looked at in the context of the entire patent); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d
9  1576, 1582 (Fed. Cir. 1996) ("intrinsic evidence is the most significant source of the legally
10 operative meaning of disputed claim language."). When a claim includes an express
11 limitation regarding a claim term, the term itself should not be interpreted as including that
12 limitation. *See Phillips*, 415 F.3d at 1324 (finding that because the claim included an express
13 limitation as to the function served by "baffles," the limitation was not inherent in the term
14 baffles because then a person skilled in the art would understand the limitation without it
15 being so stated).

16 A court must consider the specification of which the claim is a part, "it is the single
17 best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (quoting *Vitronics*,
18 90 F.3d at 1582). "The longstanding difficulty is the contrasting nature of the axioms that
19 (a) a claim must be read in view of the specification and (b) a court may not read a limitation
20 into a claim from the specification." *Innova*, 381 F.3d at 1117. In other words, the written
21 description provides context and should be examined for purposes of understanding a claim's
22 meaning, however, the written description and the embodiments therein "will not be used to
23 limit claim language that has broader effect." *Id.* The purpose of a specification is to allow
24 a person skilled in the art to make the invention, and providing an example is one of the best
25 ways to enable a person to create the invention. *Phillips*, 415 F.3d at 1323. "Much of the
26 time, upon reading the specification in that context, it will become clear whether the patentee
27 is setting out specific examples of the invention to accomplish those goals, or whether the
28 patentee instead intends for the claims and the embodiments in the specification to be strictly

- 5 -

coextensive." *Id.* If the inventor disavows a particular claim scope in the specification, that is dispositive. *Id.* at 1316.

To the extent the Court finds extrinsic evidence helpful in assessing the meaning of the claims it may be considered but it cannot be used to vary or contradict the meaning of the claims. *Markman*, 52 F.3d at 980, 981, 983. The need for extrinsic evidence arises when the Court is unfamiliar with terminology from the area of art from which the patent arises. *Id.* at 986. The type of extrinsic evidence that may be helpful "to explain scientific principles, the meaning of technical terms, and terms of art," are "expert and inventor testimony, dictionaries, and learned treatises." *Id.* at 980. If a court allows the parties to present extrinsic evidence, any such evidence, including expert testimony, that is inconsistent with the intrinsic evidence should not be given any weight. *Vitronics*, 90 F.3d at 1584. Regarding expert opinions on claim construction, the Court "has complete discretion to adopt the legal expert opinion as its own, to find guidance from it, or to ignore it entirely, or even to exclude it." *Markman*, 52 F.3d at 983; *see Vitronics*, 90 F.3d at 1585 ("opinion testimony on claim construction should be treated with the utmost caution, for it is no better than opinion testimony on the meaning of statutory terms."). The order in which a judge consults various sources is not critical, "what matters is for the court to attach the appropriate weight to be assigned to those sources in light of the statutes and policies that inform patent law." *Phillips*, 415 F.3d at 1324 (citing *Vitronics*, 90 F.3d at 1582).

"[O]nly those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy." *Vivid Technologies, Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999). As a general rule, all claim terms are presumed to have meaning and will not be construed to be superfluous. *Innova*, 381 F.3d at 1119. Similarly, when a patent uses different terms the court can infer that the patentee intended those terms to have different meanings; however, such an inference is not dispositive when the context reveals that different words are used to express the same concept. *Id.* at 1119, 1120. "General descriptive terms will ordinarily be given their full meaning; modifiers will not be added to broad terms standing alone." *Johnson*, 175 F.3d at 989. The doctrine of claim

differentiation means "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Phillips*, 415 F.3d at 1315; *Innova*, 381 F.3d at 1123. "The fact that a patent asserts that an invention achieves several objectives does not require that each of the claims be construed as limited to structures that are capable of achieving all of the objectives." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 908 (Fed. Cir. 2004). Ultimately, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction. *Phillips*, 415 F.3d at 1316.

## CLAIM CONSTRUCTION

The parties asked the Court to construe seven terms, labeled as A through G below. Synthes contends that none of the terms need construction because they are all plain on their face, however, they offer a construction if the Court finds construction necessary. Synthes notes in its brief that the parties are primarily disputing the terms "elongated" and "substantially circular." Diverse agrees that the dispute is focused on the shape of the holes in the bone plates at issue in the three patents. (Doc. 103 at 4.) Before addressing the specific terms, the Court addresses Synthes's construction approach and the relevance of the expert testimony.

Synthes construes five of the terms in relation to the type of screw that can be put through the bone plate hole (threaded and non-threaded). By way of shorthand, the parties referred to these constructions as "functional." Defendants reject this functional approach because they contend the language used in the claims is not functional but structural and should be similarly construed. The Court agrees that the language of the patents' claims do not invoke a functional construction.[1] However, the Court does not reject Synthes's

---

[1] When a patentee intends to describe an element of an invention in terms of its function, the governing statute provides that it be expressed as a "means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or

- 7 -

constructions simply on that basis because their constructions go beyond a strictly functional approach by providing some structural parameters. Their specific constructions are addressed below with respect to each term.

Although the medical inventions covered by these patents are somewhat technical, the terms in dispute generally are not; therefore, the meaning of many of the claim terms is within the lay knowledge of the Court. *See Phillips*, 415 F.3d at 1314 (claim construction may involve "little more than the application of the widely accepted meaning of commonly understood words."). In their briefs, Defendants cite and rely upon deposition testimony of Plaintiffs' expert, Wilson C. Hayes, Ph.D., although Plaintiffs did not cite to his testimony or report. At the Court's suggestion that the terms could be construed without resorting to this extrinsic evidence, Defendants agreed. Thus, the Court does not rely on Dr. Hayes's deposition or report in construing the terms. *See Northern Telecom Ltd. v. Samsung Elec. Co.*, 215 F.3d 1281, 1288 (Fed. Cir. 2000) (precluding the use of extrinsic evidence if the ordinary meaning of a term does not render the claim unclear).

**A.      "elongated holes being oblong in shape and having a major axis $D_L$ and a minor axis $D_Q$, with $D_L$ being greater than $D_Q$" ('686 patent, Claim 1)**

| Synthes | Diverse |
|---|---|
| elongated holes, or slots, each having a length ($D_L$) greater than its width ($D_Q$), such that a bone screw with a non-threaded head may be screwed through the elongated hole within a range of angles with respect to the bone plate | lengthened circles having a major diameter and a minor diameter perpendicular thereto and in which the major diameter is longer than the minor diameter |

---

acts described in the specification and equivalents thereof." 35 U.S.C. § 112. Review of the claims at issue make clear that they were not drafted with means plus function language that invokes this statutory provision. *Phillips*, 415 F.3d at 1311 (absence of the word "means" creates a rebuttable presumption that claim is not invoking statute, which only applies to "purely functional limitations that do not provide the structure").

- 8 -

**B.     "[first] hole defining a central axis and being elongated in a direction substantially aligned with the longitudinal axis" ('759 patent, Claims 1, 14, 24)**

| Synthes | Diverse |
|---|---|
| elongated [first] hole defining a central axis, the elongated hole having a length that is substantially aligned with the long direction of the bone plate and that is greater than the width of the hole, such that a bone screw with a non-threaded head may be screwed through the elongated hold within a range of angles with respect to the bone plate | a lengthened circle |

The only word among these claim terms for which Diverse seeks construction is "elongated." With respect to the other words in the phrase, the parties merely provide synonyms for the terms, which do not illuminate the meaning and suggest that the terms do not require construction. Based on the parties' focus solely on the term elongated, the Court finds that construction of the remainder of the phrase is unnecessary.

Elongated appears in terms A and B, describing holes in the '686 patent and the '759 patent, and again in terms E and F describing the periphery in the '441 patent. The parties agree that the term elongated should be given a consistent meaning in each of the claims in which it is used and in all three patents. Therefore, the Court addresses all of the parties' arguments regarding the term elongated in this discussion.

Synthes does not propose a construction specific to the term elongated. Therefore, the Court begins with an analysis of Diverse's proposed construction that elongated means "lengthened circle." The idea of a lengthened circle has no readily understood ordinary meaning. It suggests, without saying it, the shape of an oval or ellipse, which are both curved like a circle; however, such a limited construction is not supported by the patent.

Diverse relies on dictionary definitions of elongated – "extended; lengthened" – and oblong – "elongated, usually from the square or circular form." (Doc. 97, Ex. 7.) These definitions support a construction encompassing both a lengthened square (rectangle)[2] and a lengthened circle (ellipse or oval). Diverse argues that the circular nature of the hole is

---

[2] The second definition of oblong in the dictionary cited by Diverse is "in the form of a rectangle one of whose dimensions is greater than the other." (Doc. 97, Ex. 7.)

- 9 -

1    clear from the specifications and the claims themselves.[3]  First, Diverse relies on the
2    drawings, specifically Figure 2 of the '759 patent.  Drawings of particular embodiments do
3    not limit the coverage provided by the claim terms.  *See Gart v. Logitech, Inc.*, 254 F.3d
4    1334, 1342 (Fed. Cir. 2001). Second, Diverse argues that the terms "central axis" from the
5    '759 patent and "center point" and "diameter" from the '441 patent are "circle-related" terms.
6    These terms are not limited solely to curved shapes and Diverse provides no support for this
7    argument. Additionally, Diverse argues that because the '759 patent discloses the possibility
8    of a second hole that is claimed as "substantially circular" in dependent Claims 13, 23 and
9    39, the first hole must be distinguished as not circular but a "lengthened circle."  These
10   dependent claims add and describe a second distinct hole in terms not used in the
11   independent claim, thus, they provide no guidance in construing the term "elongated."

12          Contrary to the arguments made by Diverse, the language of the patents do not restrict
13   elongated to a circular shape.  First, Claim 1 of the '686 patent states that the shape of the
14   hole is "oblong," which the ordinary definition states is as likely to be curved as not.
15   Additionally, in Claim 1 of the '686 patent, the patentee describes the plate itself as
16   elongated, '686 patent 3: 3, and the plate is depicted as a thin somewhat rectangular shape,
17   '686 patent, figures 1, 2.  Construing the plate to be a "lengthened circle" would place the
18   preferred embodiments for the plate of the '686 patent outside the scope of the claim, which
19   the Federal Circuit instructs is almost never the correct construction.  *Vitronics*, 90 F.3d at
20   1583 (the rare interpretation that would read out a preferred embodiment requires "highly
21   persuasive evidentiary support").  Second, the specification of the '441 patent states that the
22   "elongated portion [of the hole] may be oval, elliptical, rectangular or any other elongated
23   shape known to one of ordinary skill in the art, including combinations of these shapes."
24   '441 patent 2: 30-33.  This language confirms that elongated need not be a curved shape.
25   Additionally, dependent Claim 4 of the '441 patent provides "wherein the elongated outer

---

[3]    Diverse also argues that one cannot have a square hole for a screw.  To the contrary, there is no reason some portion of the hole or the entirety of it could not be angled such that straight edges are engaged by the screw head.

- 10 -

periphery is substantially elliptical." '441 patent 7: 37-38. Because the elongated shape is specified to be elliptical in a dependent claim, the Court presumes that the elongated shape is not limited to being elliptical. *Phillips*, 415 F.3d at 1315; *Innova*, 381 F.3d at 1123. In sum, Diverse's construction of elongated as a lengthened circle provides no guidance and limiting elongated to meaning a curved shape is contrary to the claims and the specifications.

Because the Court has rejected Diverse's construction and Synthes has not proposed one specific to the term elongated, the Court assesses the customary and ordinary understanding of this term in light of the parties' briefing generally. Synthes proposes that the whole phrase should be construed in terms of how a screw is used in the hole. Such a construction is not supported by the totality of the patents. First, as noted above, the '686 patent also uses the term elongated to describe the bone plate itself, and the term as used in that context does not relate to the plates ability to receive a screw with a non-threaded head at various angles. Second, numerous dependent claims in the various patents are directed to the interaction of a screw with the elongated hole: "wherein said at least one elongated hole further comprises an outwardly flared countersink surface adjacent the upper surface for slidingly receiving a bone screw having a spherical head . . . wherein the outwardly flared countersink surface is shaped and configured for mating engagement with the bone screw . . . wherein the outwardly flared countersink surface . . . is sufficient to produce a ramping effect for engagement with a bone screw . . . the spherical head of the screw ramps downwardly along the flared surface to move the plate to generate compression," '686 patent 3: 29-32, 4: 1-3, 4-7, 19-21 (Claims 6, 7, 8, 10); "wherein the hole is configured and dimensioned to engage a substantially spherical screw head and provide compression of fractured bone fragments. . . wherein the tapered portion of the outer perimeter defines at least one ramp surface for engagement with a screw head . . . wherein the non-threaded portion is configured and dimensioned to engage a substantially spherical screw head and provide compression of fractured bone fragments," '759 patent 6: 17-19, 61-63, 8: 1-4 (Claims 7, 19, 30); "wherein the second portion is configured and dimensioned to engage a screw-head and provide compression of fractured bone fragments," '441 patent 7: 42-44 (Claim 6). Although the

1 purpose of the elongated portion of the hole may be to allow entry of a screw at different
2 angles, because the patentee did not describe the term in the independent claims in that
3 manner but did so in the dependent claims, the Court declines to adopt Synthes's approach.

4 Claim 1 of the '686 patent states that the elongated portion of the hole is oblong and
5 has two axes, one of which is longer than another. This explanation, taken in conjunction
6 with the dictionary definitions of elongated and oblong cited by Diverse, provide a basic
7 construction for the term. Generally, these parameters suggest that elongated means a greater
8 length than width. This construction is supported by the specifications without importing
9 limitations therefrom: "the holes . . . when measured in the direction of the plate . . . the
10 major axis $D_L$ is larger than the minor axis $D_Q$ perpendicular to the plate," '686 patent 2: 29-
11 33; "First dimension $D_L$ is substantially parallel to longitudinal axis 3, and a second
12 dimension $D_Q$ is substantially perpendicular to longitudinal axis 3. First dimension $D_L$ is
13 preferably larger than second dimension $D_Q$," '759 patent 4: 48-51; "the second portion
14 (elongated portion) may have a diametrical dimension that is greater in one directions than
15 another. For example, the diameter of the elongated portion may be greater in the direction
16 of the longitudinal axis of the plate than in the direction substantially perpendicular to the
17 longitudinal axis," '441 patent 2: 25-30.

18 The Court construes "elongated" to mean "having a greater length than width."

19 **C.    "a first portion defining a substantially circular outer periphery" ('441 patent, Claim 2)**
20

| Synthes | Diverse |
|---|---|
| a first portion having an outer boundary (periphery) shaped substantially like a portion of a circle | a circular hole portion |

23 **D.    "a first portion having a substantially circular outer periphery defining a first center point" ('441 patent, Claim 1)**
24

| Synthes | Diverse |
|---|---|
| a first portion having an outer boundary (periphery) shaped substantially like a portion of a circle, and defining a first center point of the combination hole | a circular hole portion having a center point |

28

At the hearing, Plaintiffs' counsel argued that terms C and D, in particular, did not require construction and that both parties' proposals took away from the claim terminology. The Court agrees that these terms speak for themselves. Synthes's proposal is merely a restatement of the language used in the claims, while Diverse's proposal strips out some of the claim language without providing any meaningful construction.

Diverse contends the modifier "substantially" is not necessary in the construction because the specification clarifies that this portion is circular. However, the part of the specification to which Diverse cites states that this portion is "substantially circular," not just circular. '441 patent 5: 3-4. Diverse argues that Synthes cited as a definition for circular, "relating to the circle or its properties <a ~ arc>," (Doc. 97-2 at 61), thus, the word encompasses any shape relating to the circle and its properties and the use of substantially is superfluous. To the contrary, substantially circular seems to concisely embody the broad definition of circular cited by Synthes and no clarity is gained by removing the modifier.

In its briefing, Synthes contended that construing the language to mean simply circular without including the language "portion of" a circle might denote a fully closed circle. Diverse agrees that the circular portion cannot be closed and, at oral argument, Synthes concurred that the remainder of the patent language adequately requires that the circular portion be open. '441 patent, 6: 62-64, 7: 1, 17-20, 23-24 (claiming one hole with two overlapping portions), 7: 8-12, 27-31 (claiming that the threads of the circular portion extend more than 180º to prevent the screw from shifting into the elongated portion of the singular hole). Thus, Synthes's proposed language "like a portion of" is not necessary.

Synthes and Diverse dispute whether the hole is two-dimensional or three-dimensional, which they suggest is relevant to the use of the language "outer periphery" or "boundary" as proposed by Synthes.[4] Synthes argues that other claim language makes clear that the outer periphery is a three-dimensional surface. Diverse agrees that the

---

[4] Diverse also argues that the term boundary is confusing and not used in the specification. Diverse does not contend, however, that "outer periphery" is confusing or requires separate construction; rather, they simply drop it from the construction.

- 13 -

1  dimensionality of the periphery is covered by other claim language and, therefore, should not
2  be read into the term circular. Synthes is not attempting to read dimensionality into the word
3  circular, rather, it attempts to preserve the integrity of the entirety of the claim phrase at issue
4  by retaining reference to the outer periphery. Whether the hole or the outer periphery is two-
5  or three-dimensional is not addressed in this claim language and will not be resolved by the
6  construction.[5] As neither party provides a sound basis for construing terms C and D (to the
7  extent they are identical), and they are easily understood on their face, the Court finds no
8  construction necessary.

9  Diverse disputes Synthes's proposal that the center point portion of term D be
10  construed as being "of the combination hole," because it contends the center point is defined
11  by the circular portion. This dispute is one solely of semantics. The center point is defined
12  by the circular portion and is also one of two center points included in the combination hole.
13  Because Synthes does not believe construction of this term is necessary and Diverse merely
14  substitutes the less precise term "having" for "defining," the Court concludes there is no need
15  to construe the language "defining a first center point" from term D.

16  Terms C and D do not warrant construction as they are plain on their face and the
17  proposed constructions do not provide clarity.

**E.    "a second portion in communication with the first portion and defining an elongated outer periphery" ('441 patent, Claim 2)**

| Synthes | Diverse |
| --- | --- |
| a second portion that overlaps the first portion and has an elongated outer boundary (periphery) such that a bone screw with a non-threaded head may be screwed into the second portion of the combination hole within a range of angles with respect to the bone plate | a lengthened circle portion overlapping the circular hole portion |

---

[5] Claims 1 and 2 of the '441 patent both provide that the combination hole extends through the upper and lower surface of the bone plate, which indicates it is three-dimensional. '441 patent 6: 59-61, 7: 16-17.

- 14 -

**F.      "a second portion overlapping the first portion . . . having an . . . elongated outer periphery defining a second center point" ('441 patent, Claim 1)**

| Synthes | Diverse |
|---|---|
| a second portion that overlaps the first portion and has an elongated outer boundary (periphery) such that a bone screw with a non-threaded head may be screwed into the second portion of the combination hole within a range of angles with respect to the bone plate, and that defines a second center point of the combination hole | a lengthened circle portion, having a center point, overlapping the circular hole portion |

The Court construed the term elongated with respect to terms A and B and, as discussed above, the same construction is applicable to terms E and F. With respect to the construction of the portions of terms E and F relating to the outer periphery and center point, the parties' dispute is the same as discussed with respect to terms C and D. As resolved above, those terms do not require construction. The only words remaining at issue are "in communication" from term E, and the Court adopts the parties' agreed construction that it means overlapping as is used in term F. *See Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1380-81 (Fed. Cir. 2006) (two independent claims may define the same subject matter with different terminology).

**G.      "combination hole" ('441 patent, Claims 1, 2)**

| Synthes | Diverse |
|---|---|
| hole capable of receiving both a bone screw with a non-threaded head, and alternatively a bone screw with a threaded head | two overlapping holes |

Neither party discusses whether there is a common and ordinary understanding of the term "combination hole" in the art. Diverse's inclusion of two holes in its proposed construction is contrary to the claim term itself, and the support Diverse cites consistently describes a *singular* hole with two overlapping portions. Therefore, the Court declines to adopt Diverse's construction.

Synthes's construction, again, focuses on the type of screws that can be used in the hole, both those with a threaded head and a non-threaded head. This construction is not entirely aligned with the claims themselves. In particular, Claim 1 describes the combination hole as including two portions, one of which is threaded and one of which is not. '441 patent

6: 63-65, 7: 1-3. Claim 2 again describes two portions, one of which is threaded; however, the second portion is not specified to be threaded or not threaded. '441 patent 7: 19-21, 23-26. Thus, although it might be possible to place either type of screw in a combination hole, Claims 1 and 2 considered together indicate that the hole is not required to have a non-threaded portion.

Plaintiffs cite and rely upon language of the patent that supports a construction similar but not identical to what they propose. In particular, the specification states that the bone plate can be used "as a compression plate or as an internal fixative," and that this objective is achieved by way of the combination hole. '441 patent 2: 8-20. The combination hole must have a substantially circular portion with a plurality of threads over more than 180º of its outer periphery and a second elongated portion overlapping the circular portion. '441 patent, 6: 59-67, 7: 1-3, 16-24. Thus, the first portion is structured to allow for a threaded locked connection with the bone plate while the second portion is structured to allow a screw to be placed through at an angle for compression.[6] In its discussion of the combination hole, Diverse also notes that the bone plate is configured to achieve its purpose of engaging a threaded screw head or allowing for angular entry in the same hole. (Doc. 105 at 4-5.)

Based on the claims and specification, the Court construes "combination hole" as "a hole configured for both a threaded connection and an angled connection."

## **RECOMMENDATION**

Based on the foregoing, the Magistrate Judge recommends that the District Court adopt the following claim constructions:

---

[6] Although resort to extrinsic evidence is not necessary, the Court notes that Dr. Hayes's testimony is not inconsistent with this construction. In his deposition, he stated that a combination hole allows for a dual function, "an angularly stable connection to bone primarily through use of a threaded connection" and "affixation to a bone through the use of a ramped or sloped connection that provided for a variety of angular orientations between the screw and bone" that could apply compression. (Doc. 97-2 at 98, pp. 22-23.)

| TERM | COURT'S CONSTRUCTION |
|---|---|
| elongated holes being oblong in shape and having a major axis $D_L$ and a minor axis $D_Q$, with $D_L$ being greater than $D_Q$<br><br>[first] hole defining a central axis and being elongated in a direction substantially aligned with the longitudinal axis | "elongated": having a greater length than width<br><br>No additional construction necessary |
| a first portion defining a substantially circular outer periphery<br><br>a first portion having a substantially circular outer periphery defining a first center point | No construction necessary |
| a second portion in communication with the first portion and defining an elongated outer periphery<br><br>a second portion overlapping the first portion . . . having an . . . elongated outer periphery defining a second center point | "in communication": overlapping<br><br>No additional construction necessary |
| combination hole | a hole configured for both a threaded connection and an angled connection |

Pursuant to Federal Rule of Civil Procedure 72(b)(2), any party may serve and file written objections within fourteen days of being served with a copy of the Report and Recommendation. If objections are not timely filed, they may be deemed waived. If objections are filed, the parties should use the following case number: **CV 09-711-TUC-DCB.**

DATED this 21st day of January, 2011.

D. Thomas Ferraro
United States Magistrate Judge

- 17 -